UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ENERGY RESOURCES, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| PETROLEUM SOLUTIONS | § | |
| INTERNATIONAL, LLC , | § | CIVIL ACTION H:08-656 |
| | § | |
| *Defendant and Third-Party Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| LEXINGTON INSURANCE COMPANY, | § | |
| | § | |
| *Third-Party Defendant.* | § | |

MEMORANDUM AND ORDER

Pending before the court is defendant and third-party plaintiff Petroleum Solutions International's ("PSI") motion for summary judgment (Dkt. 55) and third-party defendant Lexington Insurance Company's ("Lexington") cross-motion for summary judgment (Dkt. 63-2). Having considered the motions, related filings, and applicable law, the court is of the opinion that Lexington's motion should be DENIED, and PSI's motion should be GRANTED IN PART AND DENIED IN PART.

I. BACKGROUND

This is an action in which PSI and Lexington each seek a declaratory judgment relating to a lawsuit filed by Energy Resources, LLC ("ERG") against PSI on February 5, 2008, in the 344th Judicial District Court of Chambers County, Texas, and then removed on the basis of diversity jurisdiction to the U.S. District Court for the Southern District of Texas on February 28, 2008. Dkt. 1. Specifically, Lexington and PSI each seek judgments on a) Lexington's duty,

or lack thereof, to defend PSI in the suit by ERG; b) Lexington's duty, or lack thereof, to indemnify PSI for any damages awarded to ERG in that same suit; and c) whether Lexington is liable to PSI for attorneys' fees, costs, and interest accrued in litigating the suit, either for violation of the Texas Prompt Payment of Claims Act or for breach of contract.

In its original petition filed in state court, ERG claimed that PSI is liable for damages resulting from PSI's alleged negligence and negligent misrepresentation while working under an oral contract with ERG to provide well site supervision and consulting services at two of ERG's oil wells: the Kirby B-44 Well ("the Kirby well") located in Chambers County, and the Marrs McLean H-6 Well ("the Marrs well") located in Galveston County. Dkt. 2-1. Specifically, ERG alleged that PSI's consultant, Don Faulkner, negligently failed to provide competent drill site supervision, causing ERG to suffer "excessive cost over-runs in drilling the wells Faulkner supervised." *Id.*

The services PSI provided to ERG in connection with ERG's wells were insured under a Comprehensive General Liability (CGL) insurance policy (No. 9606692) (the "Policy") issued by Lexington. Dkt. 47. Following the filing of ERG's original petition and removal of the action to this court, PSI sent Lexington a copy of the original petition and made a demand for defense and indemnity in a letter dated March 3, 2008. Dkt. 55. Lexington sent a letter to PSI on July 2, 2008, denying coverage on the basis that the factual allegations in the complaint did not allege an "occurrence" resulting in "property damage" as those terms are defined in the Policy or, alternatively, that the damages alleged by ERG were excluded from coverage by the Policy's Endorsement #11. Dkt. 55, Exh. A.

ERG filed its first amended complaint on July 13, 2009, alleging breach of contract and fraud in addition to the causes of action alleged in its original complaint. Dkt. 31. The first amended complaint contains more detailed allegations regarding the damages that allegedly resulted from Faulkner's negligent acts. *See id.* Those allegations include stuck and/or damaged drill pipe, lost and/or damaged equipment, the Marrs well being drilled in an incorrect direction that required four unnecessary sidetracks, damage to the casing shoe and cement liner of that same well, excessive downtime as a result of an inadequate drilling rig, the Kirby well packing off and becoming stuck as a result of excessive drill speed, and ERG being required to redrill both the Marrs and Kirby wells. *Id.*

On June 17, 2010, PSI filed a third-party complaint against Lexington seeking a declaratory judgment that Lexington is contractually obligated to defend PSI in the underlying lawsuit based on the language of the Policy, the allegations in ERG's first amended complaint, and discovery in the ERG lawsuit. Dkt. 47. Additionally, PSI seeks recovery of its costs and attorneys' fees incurred in both the ERG lawsuit and in its action against Lexington, as well as 18% interest under the Texas Prompt Payment of Claims Act. Dkt. 47. PSI served Lexington with the third-party complaint on June 17, 2010, but it did not provide Lexington with a copy of ERG's first amended complaint until November 8, 2010. Dkt 63.

The policy language at issue in this case is contained in Section I (Coverages), Section IV (Definitions), Endorsement # 11 (Limited Professional Liability), Endorsement #7 (Oil Industry Endorsement), and Endorsement #1 (Self-Insured Retention) of the Policy. The dispute centers around whether the factual claims in ERG's complaint allege a covered "occurrence" resulting in "property damage," as those terms are defined in the Policy, whether the limitations in

3

Endorsements #7 and #11 apply to exclude the allegations from coverage, and whether PSI has exhausted its self-insured retention as required by Endorsement #1.  Section I of the Policy provides, in pertinent part:

**1.       Insuring Agreement**

      a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily Injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages because of "bodily injury" or "property damage" to which this insurance does not apply.

      b.      This insurance applies to "bodily injury" or "property damage" only if:
      (1)      The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; . . . .

Dkt. 55, Exh. B.  Section IV of the Policy contains the definitions of specific terms used in the Policy, including the disputed terms at issue here.  It provides, in pertinent part:

      13.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general conditions.
    . . .
      17.     "Property damage" means:
      a.     Physical injury to tangible property, including all resulting loss of use of that property.
      b.     Loss of use of tangible property that is not physically injured.

*Id.*  Endorsement # 11, the "Limited Professional Liability Endorsement," provides a limited exclusion of coverage for damages related to "professional services."  It provides, in pertinent part:

      It is agreed that coverage under this policy shall not apply to damages arising out of the rendering of, or failure to render, professional services or any error or omission or mistake of a professional nature performed for others in the Insured's capacity as an architect, engineer, or consultant . . . .

> However, this exclusion shall not apply to "bodily injury" or "property damage"
> resulting from the aforementioned professional services or error, omission, or
> mistake. The term "property damage" as used in the endorsement means only
> physical injury to tangible property.

*Id.* Endorsement #7, the "Oil Industry Endorsement," contains limited exclusions of coverage

for certain specific damages related to oil industry operations.  The Endorsement provides, in

pertinent part:

> It is agreed that this policy shall not cover any liability imposed upon the insured
> by law or assumed by the insured under contract for or arising out of:
> . . .
> 2.      loss of, damage to, or loss of use of drilling tools, pipes, collars, machinery,
>         and equipment leased or rented to, or in the care, custody, or control of any
>         Insured.

*Id.* Finally, Endorsement #1, the "Self-Insured Retention Endorsement," applies a self-insured

retention of $100,000 per claim that PSI agrees to assume.  The endorsement provides, in

pertinent part:

> **I.      LIMITS OF INSURANCE**
>
> The LIMITS OF INSURANCE . . . shall apply excess of a Self-Insured
> Retention (hereinafter referred to as the "Retained Limit") in the amount
> of:
>         $100,000        each "occurrence"
> . . .
> and you agree to assume the retained limit. The Retained Limit, or any
> part of it, shall not be insured without our prior written approval.
>
> **II.     DEFENSE AND SETTLEMENT- COVERAGES A AND B**
> . . .
> **A.      WITHIN THE RETAINED LIMIT**
> We do not have the duty to investigate or defend any "occurrence", claim
> or "suit" unless and until the Retained Limit is exhausted with respect to
> that "occurrence", claim or "suit."

*Id.*

5

PSI moved for summary judgment on December 27, 2010, seeking declaratory relief in its favor on Lexington's duty to defend PSI in the underlying suit and reimbursement plus 18% interest for the defense costs it has incurred so far.  PSI argues that the factual allegations in both ERG's original petition and its first amended complaint describe "occurrences" resulting in "property damage," as those terms are defined in the Policy, thus triggering Lexington's duty to defend PSI in the underlying suit as a matter of law.  Dkt. 55.  PSI also argues that Lexington's refusal to defend PSI in the underlying suit is a violation of the Prompt Payment of Claims Act, thereby entitling PSI as a matter of law to an award of reasonable attorneys' fees and costs incurred in defending the underlying suit, prejudgment interest and penalty interest of 18% for the fees and costs incurred defending the underlying suit, and fees and costs incurred while pursuing its third-party action against Lexington.  *Id.*  In the alternative, PSI argues that Lexington is liable to PSI for breach of contract under Texas law, thereby entitling PSI as a matter of law to an award of reasonable attorneys' fees, costs, and prejudgment interest under section 38.001 of the Texas Civil Practice and Remedies Code.  *Id.*

Lexington filed a response in opposition to PSI's summary judgement motion and a cross motion for summary judgment on February 2, 2011.  Dkt. 63.  Lexington seeks denial of PSI's request for declaratory relief on the duty to defend and PSI's request for attorneys' fee, costs, and interest, and Lexington requests declaratory relief in its favor on the duty to defend and the duty to indemnify.  *Id.*  Lexington argues that neither ERG's original petition nor its first amended complaint alleges an "occurrence" as the term is defined in the Policy.  *Id.*  Although ERG's claims are for damages primarily resulting from the alleged negligence of PSI in performing its contractual duties, Lexington argues that the facts alleged describe only voluntary

and intentional acts that fall outside of the Policy's definition of "occurrence" and thus fail to trigger Lexington's duty to defend.  *Id.*  Lexington further argues that the damages in both the original petition and the first amended complaint are not "property damage" as that term is defined in Endorsement #11, which Lexington alleges contains a narrower definition of the term than that contained in Section IV (Definitions).[1]  *Id.*  Additionally, Lexington argues that any alleged damage that might fit Endorsement #11's definition of "property damage" is nevertheless excluded from coverage by Endorsement #7 because it is damage to drilling equipment under the care, custody, or control of PSI.  *Id.*  For these reasons, Lexington argues that neither the original petition nor the first amended complaint triggered its duty to defend or indemnify PSI in the underlying suit and that Lexington thus cannot be liable for breach of contract or for a violation of the Texas Prompt Payment of Claims Act.  *Id.*  Lexington also argues that even if the factual allegations in either complaint are sufficient to trigger the duty to defend, Lexington is not liable for defense costs because PSI has not proven that it exhausted the $100,000 self-insured retention contained in Endorsement #1.  *Id.*

## II. LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).

---

[1]  Lexington contends, and PSI has not disputed, that Endorsement #11 applies here because the damages arise out of PSI's alleged negligent performance of professional services.  However, PSI does dispute Lexington's argument that Endorsement #11 contains a narrower definition of "property damage" than that contained in part a) of Section IV.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id.* "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the

non-movant. *Envl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

### III. ANALYSIS

The questions presented to this court for summary judgment all require interpretation of the terms of the Policy. Since insurance policies are contracts, they are construed using ordinary rules of contract interpretation. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828,831 (Tex. 2009). The primary goal of construction is to give effect to the parties' intent as reflected in the terms of the Policy. *Id.* The Policy must be read as a whole, and effect must be given to all parts if possible. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010). Unambiguous language must be enforced as it is written, while ambiguous language must be resolved in favor of the insured if it is reasonable to do so. *Don's Bldg. Supply v. One Beacon*

9

*Ins.*, 267 S.W.3d 20, 23 (Tex. 2008).   Language is ambiguous only if it is susceptible to more than one reasonable interpretation.   *Id.*   Language is not ambiguous merely because the parties interpret it differently.   *Fiess v. State Farm Loyds*, 202 S.W.3d 744, 746 (Tex. 2006).   Whether a particular provision or the interaction among multiple provisions creates an ambiguity is always a question of law, and ambiguity must be determined by the four corners of the Policy itself without reference to parole evidence.   *Page*, 315 S.W.3d at 527.

### A. Lexington's duty to defend PSI in the underlying suit

The primary issue in this case is whether the factual allegations in ERG's original petition and first amended complaint trigger Lexington's duty to defend PSI in the underlying suit.   PSI argues that the factual allegations in both pleadings describe "property damage" stemming from "occurrences" as those terms are defined in the Policy, thus triggering Lexington duty to defend PSI.   Dkt. 70.   Lexington, on the other hand, argues that ERG's allegations in both the original petition and the first amended complaint do not allege an "occurrence" under the Policy or any "property damage" that is not excluded by either Endorsement #11 or Endorsement #7.   Dkt. 63-2.   Moreover, Lexington argues that even if the original petition or first amended complaint alleged an "occurrence" resulting in "property damage," PSI has failed to show that it has exhausted the $100,000 self-insured retention limit contained in Endorsement #1.   *See id.*

### 1. Legal Standard: Duty to Defend

Under Texas Law, an insurer has a duty to defend its insured in an underlying suit if any allegation in the complaint, if taken to be true, is even potentially covered by the terms of the Policy.   *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex.

2006).  The duty to defend is defined by the terms of the policy.  *Id.*  The insured bears the initial burden of establishing that a claim against it is potentially within the Policy's coverage.  *Northfield Ins. Co. v. Loving Home Care*, 363 F.3d 523, 528 (5th Cir. 2004).  The burden then shifts to the insurer to prove that an exception applies to bar coverage.  *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 1997).

Allegations against the insured are liberally construed in favor of coverage.  *Nat'l. Union Fire Ins. Co. v. Merchants Fast Motor Lines*, 939 S.W.2d 139, 141 (Tex.1997).  Only if all allegations fall outside the scope of the Policy does the insurer have no duty to defend its insured.  *Pine Oak Builders v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 655 (Tex. 2009).  In making its determination, the court must focus on the factual allegations in the complaint and not the legal theories under which they are alleged.  *Nat'l. Union*, 939 S.W.2d at 141.  Ordinarily, the duty to defend is determined by examining the latest, and only the latest, amended pleadings.  *Rhodes v. Chicago Ins. Co.*, 719 F.2d 116, 119 (5th Cir. 1983).  However, if there is an issue as to whether the duty to defend arose under original or first amended complaint, the district court must examine both versions of the complaint to determine under which version the duty arose.  *Id.* at 119-20.

Texas follows the "eight corners" rule of insurance contract interpretation to determine an insurer's duty to defend its insured.  *GuideOne Elite*, 197 S.W.3d at 308.  Under this rule, an insurer's duty to defend is determined by the pleadings in the underlying action, considered in light of the policy provisions, without regard to the truth or falsity of the allegations contained therein.  *Id.*  Only the policy and the pleadings are ordinarily relevant to the determination, and

facts outside the pleadings are ordinarily not material to the determination. *Nat'l. Union Fire Ins. Co.*, 939 S.W.2d at 141.

*2. Extrinsic Evidence*

In support of its argument that Lexington's duty to defend PSI has been triggered as a matter of law by the allegations in ERG's first amended complaint, PSI has offered as evidence its correspondence with Lexington (Dkt. 55, Exh. A), excerpts from the deposition of ERG's owner and president Scott Wood (Dkt. 55, Exh. C), and excerpts from the deposition of ERG geologist Phillip Jewett (Dkt. 55, Exh. D). PSI argues, notwithstanding the eight-corners rule, that two Texas Supreme Court opinions, *GuideOne Elite* and *Pine Oak Builders*, support the allowance of extrinsic evidence in this case. Dkt. 55. In *GuideOne Elite*, the plaintiff argued that the Texas Supreme Court should recognize an exception to the eight-corners rule when the extrinsic evidence offered is primarily relevant to the issue of coverage. *GuideOne Elite*, 97 S.W.3d at 308. However, the Texas Supreme Court held that even if it recognized an exception to the eight-corners rule, extrinsic evidence presented by the defendant could not be considered because it directly contradicted the plaintiff's allegations. *Id.* In *Pine Oak Builders*, the Texas Supreme Court stated, "In deciding the duty to defend, the court should not consider extrinsic evidence from either the insurer or the insured that contradicts the allegations of the underlying petition." 279 S.W.3d at 655. However, the *Pine Oak Builders* court did not note whether it would consider the evidence if it did not contradict the allegations. *Id.* PSI contends that these holdings implicitly permit an exception to the eight-corners rule if the extrinsic evidence in question does *not* contradict the allegations of the underlying petition. Dkt. 55. PSI further argues that the evidence in question does not touch on the merits of ERG's complaint, and that

this court is thus permitted to consider it when deciding if Lexington's duty to defend has been triggered. *Id.*

Lexington, on the other hand, argues that the cases relied upon by PSI do not support an exception to the eight-corners rule. Dkt. 63-2. Lexington points out that the Texas Supreme Court did not apply an exception to the eight-corners rule in the cases cited by PSI, and instead merely acknowledged that other courts have recognized such an exception. *Id.* In the alternative, Lexington argues that the extrinsic evidence extends directly to the factual merits of the underlying petition. *Id.*

After reviewing the jurisprudence of the Texas Supreme Court and the Fifth Circuit on this issue, this court declines to apply PSI's proposed exception to the eight-corners rule. Although PSI is correct that the Texas Supreme Court has not explicitly rejected an exception to the eight-corners rule when the extrinsic evidence in question does not contradict the allegations in the underlying complaint or touch on the merits of the underlying complaint, Lexington is also correct that the Texas Supreme Court has never recognized or applied any such exception. Neither the *GuideOne Elite* decision nor the *Pine Oak Builders* decision expressly recognized an exception, even in dicta, and neither offers convincing support for PSI's argument that an exception is permitted under Texas law. This court thus finds it relatively clear that, at this point, no applicable exception exists under Texas law.

Moreover, even if the cases were less clear, the court finds that it would be inappropriate to apply PSI's proposed exception. When the substantive state law applied in a federal action based on diversity jurisdiction is unclear, it is the duty of the federal court to determine as best it can what the highest court of the state would decide. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64

(1938); *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992). This court need not makes its own *Erie* guess, however, because the Fifth Circuit has already "guessed" that the Texas Supreme Court would not recognize any exception to the strict eight-corners rule. *Northfield Ins. Co.*, 363 F.3d at 531. Without clear recognition of an applicable exception by the Texas Supreme Court, the Fifth Circuit's *Erie* guess is controlling. As such, this court will not consider any evidence outside of ERG's complaint and the Policy to determine whether Lexington has a duty to defend PSI.

*3. "Occurrence"*

The Policy provides that coverage only applies to "bodily injury" or "property damage" resulting from an "occurrence" within the "coverage territory." Dkt. 55, Exh. B. The Policy goes on to define "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general conditions." *Id.* The term "accident," however, is not defined in the Policy. PSI and Lexington disagree as to whether any of the damage alleged by ERG in either of the original petition or the first amended complaint was caused by an "occurrence" as that term is defined in the Policy.

Both the Texas Supreme Court and the Fifth Circuit have had occasion to discuss and to outline the boundaries of the term "occurrence" as it is defined in the Policy in the context of determining whether an insurer's duty to defend its insured has been triggered by the allegations in the underlying complaint. According to the Texas Supreme Court, "an occurrence is simply an unexpected consequence of an insured's act, even if due to negligence or faulty work." *Lamar Homes v. Mid-Continent Cas. Co*., 242 S.W.3d 1, 8 (Tex. 2007). Damage naturally resulting from an intentional tort, however, is not an accident and thus not an occurrence

14

regardless of whether the effect was unintended or unexpected. *Argonaut S.W. Ins. Co. v. Maupin*, 500 S.W.2d 633, 636 (Tex. 1973).   On the other hand, damage resulting from a deliberate but negligently performed act is nevertheless an accident if the effect is not the intended or expected result—that is, the result would have been different had the deliberate act been performed correctly. *Mass. Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 400 (Tex. 1967).   An obligor who intends his performance to result in damage—or, one who commits an act that is legally deemed to constitute an intentional tort—is a *Maupin* tortfeasor. *Admiral Ins. Co. v. Little Big Inch Pipeline Co.*, 523 F.Supp.2d 524, 534 (W.D. Tex. 2007).   On the other hand, an obligor who intends his performance to be correct, but who negligently falls short of the appropriate standard and causes unintentional damage, is an *Orkin* tortfeasor. *Id.* at 534-35.   Noting the two lines of cases that have developed from the *Maupin* and *Orkin* decisions, the Fifth Circuit has concluded that the terms "accident" and "occurrence" include damage that is the "unexpected, unforeseen or undesigned happening or consequence" of an insured's negligent behavior, including "claims for damage caused by an insured's defective performance or faulty workmanship." *Federated Mut. Ins. Co. v. Grapevine Excavation*, 197 F.3d 720, 725 (5th Cir. 1999).

PSI argues that the allegations in ERG's original petition and first amended complaint describe only negligent conduct, the results of which were not intended or expected by PSI's consultant.   Dkts. 55; 70.   PSI points out that ERG's allegations are couched in terms of inattentiveness, mistakes, failure to exercise the requisite degree of care, failure to pay the requisite attention, failure to apprise ERG of certain conditions, and unprofessional conduct. Dkt.70 (citing Dkt. 31).   PSI contends that these allegations describe only "failure to use

reasonable care" or negligent "defective performance and faulty workmanship" without any claim by ERG that PSI expected or intended the resulting damage, and thus the allegations describe "occurrences" because PSI is only alleged to have committed torts controlled by the *Orkin* line of cases.  Dkt. 55 (citing *Orkin*, 416 S.W.2d at 400); Dkt. 70.

Lexington, on the other hand, points out that the court must rely on the factual allegations in the underlying complaint rather than the theories alleged.  *Nat'l. Union Fire Ins. Co.*, 939 S.W.2d at 141.  According to Lexington, despite the fact that nearly all of the torts alleged in the original petition and first amended complaint are premised on negligence, none of the allegations describes an "occurrence."  Dkt. 63-2.  Lexington asserts that "ERG very clearly and explicitly alleged that the actions and/or inactions of PSI and/or its consultant were deliberate and/or intentional."  *Id.*  Thus, Lexington argues that the torts are controlled by the *Maupin* line of cases.  *See id.*  Relying solely on the Fifth Circuit's brief summary in *Grapevine* of the principle announced in *Maupin*, Lexington contends that PSI's alleged "deliberate and intentional conduct" cannot be considered "occurrences."  Dkts. 63-2, 73.  In *Grapevine*, the Fifth Circuit stated, "According to this body of law, damage that is the natural result of voluntary and intentional acts is deemed not to have been caused by an occurrence, no matter how unexpected, unforeseen, and unintended that damage may be.  Both state and federal courts sitting in Texas have relied on *Maupin* to deny insurance defense and coverage in a steady stream of cases (the "*Maupin* line"), *all of which involve the alleged commission of an intentional tort* by the insured."  *Grapevine*, 197 F.3d at 723 (emphasis added).

While Lexington is correct that this court must focus on the complaint's factual allegations showing the origin of the damages and not the legal theories that have been alleged,

16

*see Nat'l. Union Fire Ins. Co.*, 939 S.W.2d at 141, Lexington is incorrect in its assertion that ERG's factual allegations do not describe negligent conduct.  With regards to the original state court petition, the petition alleges that Faulkner—the PSI well site consultant—"did not exercise a degree of care commensurate with the knowledge and skill required of an ordinarily prudent well site drilling supervisor" and that this alleged lack of care resulted in "excessive cost over-runs in drilling the wells Faulkner supervised."  Dkt. 1-5.  This factual allegation does not support any intentional tort theory, nor does it suggest that Faulkner expected his conduct to cause damage.  Faulkner is thus an *Orkin* tortfeasor, and the alleged conduct in the original petition sufficiently describes an "occurrence."  *Orkin*, 416 S.W.2d at 400.

The first amended complaint likewise alleges negligent, not intentional, conduct.  As to the Marrs well, ERG alleges that Faulkner failed to adequately supervise drilling personnel, was inattentive during drilling operations, and failed to alert ERG of the inadequacy of a drilling rig.  Dkt. 31.  These are all allegations of negligence—not intentional torts or even "voluntary and intentional acts."  As to the Kirby Well, ERG alleges that Faulkner failed to pay the requisite attention during drilling operations, which similarly describes only negligence through inactivity rather than through "voluntary and intentional" action.  *See id.*

Lexington offers only two specific examples of "deliberate and/or intentional" acts alleged in ERG's first amended complaint, without mentioning how any of the numerous other allegations are "deliberate and/or intentional."  Those examples are: 1) PSI knew or should have known of the inadequacies in a rig supplied to the drilling site but failed to apprise ERG of the rig's problems, and 2) PSI's consultant disregarded a warning from an ERG employee and continued to drill at an excessive rate of speed, causing the drill to become stuck.  *See* Dkt. 63-2.

This court fails to see how the first example involves any allegation of deliberate or intentional conduct.    And while the second example is arguably a deliberate and/or intentional act, Lexington's reliance on the holding in *Maupin* for the assertion that the resulting damage cannot be considered an "occurrence" is misplaced.    As even the Fifth Circuit's brief synopsis of *Maupin*'s holding (cited repeatedly by Lexington) makes clear, that case and all of its successors held only that an *intentional tort* is not an accident or occurrence that would trigger the insurer's duty to defend.   *Grapevine*, 197 F.3d at 724.   In *Maupin*, the tort alleged was trespass; in other cases following *Maupin*, the intentional torts alleged have included assault, battery, and invasion of privacy.   *See Maupin*, 500 S.W.2d at 636; *State Fire & Cas. Ins. Co. v. Brooks*, 43 F.Supp.2d 695, 702 (E.D. Tex. 1998) (damage resulting from "unconsenting sexual acts" is not an occurrence); *Metro. Prop. & Cas. Co. v. Murphy*, 896 F.Supp. 645, 648 (E.D. Tex. 1995) (woman's allegation that the defendant had secretly watched her bathe and dress through holes drilled in her bathroom wall did not allege an "occurrence"); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 828 (Tex. 1997) (damage resulting from photo lab clerk's intentional act of replicating pictures of a woman and showing them to his friends was not an "accident" within the meaning of the policy regardless of whether he intended to cause her harm).   In fact, none of the cases in the *Maupin* line has involved factual allegations constituting negligence. Lexington seems to believe that the "voluntary and intentional" nature of a small subset of PSI's alleged acts takes all of them out of the realm of negligence and into *Maupin*'s purview.   This argument disingenuously ignores the fact that countless valid claims of negligence are based on deliberately performed acts that fail to meet the recognized standard of care.   As the Texas Supreme Court has unequivocally stated, "the mere fact that 'an actor intended to engage in the

conduct that gave rise to the injury' does not mean that the injury was not accidental." *Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 155 (Tex. 1999). The simple fact that an act is deliberately performed does not preclude negligence or prove an intentional tort, and Lexington offers no suggestion of any intentional tort theory that the factual allegations in the complaint do support.

The conduct alleged in the first amended complaint is nothing more than a set of negligent acts, the results of which may have been different had Faulkner exercised the appropriate level of care. As PSI correctly points out, Texas courts have consistently held this type of tort to be an "occurrence" so long as the resulting damage was not intended or expected by the tortfeasor. *See Orkin*, 416 S.W.2d at 400; *Lamar Homes*, 242 S.W.3d at 8, *Grapevine*, 197 F.3d at 725. Lexington has not argued that Faulkner intended the *damage* that resulted from his alleged negligent acts, nor does ERG claim in its first amended complaint that he did.

Lexington does argue however that the first amended complaint alleges that *ERG*'s employee, Phillip Jewett, expected the damage resulting from Faulker allegedly drilling at an excessive rate of speed. Dkt. 63-2 at 23. Jewett allegedly warned Faulkner of the impending consequences, a warning that Faulkner disregarded. *Id.* (discussing the first amended complaint). But the court need not determine, for the purposes of the instant motion, if this singular factual allegation describes an "occurrence." Even if Faulkner's alleged fast drilling is not a covered "occurrence," Lexington will not necessarily be free from its duty to defend PSI. An insurer has a duty to defend its insured in an underlying suit if *any* allegation in the complaint, if taken to be true, is even potentially covered by the terms of the policy. *GuideOne Elite*, 197 S.W.3d at 310. All of the other allegations in the first amended complaint fall into the

*Orkin* class of unintended or unexpected consequences of negligent acts, and thus are "occurrences."

*4. "Property Damage"*

In order to trigger Lexington's duty to defend PSI in the underlying suit, at least one of the alleged "occurrences" in ERG's complaint must have allegedly resulted in "property damage."  Section IV of the Policy contains two definitions of "property damage": "a) Physical injury to tangible property, including all resulting loss of use of that property", and "b) Loss of use of tangible property that is not physically injured."  Dkt. 55, Exh. B.  Endorsement #11, excludes coverage of most damages arising out of the rendering of professional services like those at issue here, but it specifically states that the exclusion does not apply to "property damage," which it states "means only physical injury to tangible property."  *Id.*  The parties disagree as to the proper interpretation of Endorsement #11's definition of "property damage," and as to whether "property damage" has been alleged by ERG in the original state court petition and the first amended complaint.

*a) Endorsement #11's Definition*

PSI argues that most, if not all, of the damages alleged in ERG's original petition and first amended complaint are "property damages" covered by the Policy.  Dkt. 70.  PSI contends that the exclusion in Endorsement #11 should be interpreted as not applying to injury to property that results in loss of use, even though the definition of "property damage" in the endorsement does not specifically state that it includes loss of use.  *Id.*  PSI points out that Endorsement #11's definition does not explicitly *exclude* "loss of use" and contends that it can be interpreted to refer

to part a) of the definition of "property damage" contained in Section IV, which expressly includes "loss of use." *Id.*

Lexington, however, contends that Endorsement #11's definition of "property damage" should be interpreted as not including "loss of use" because, unlike the definition in Section IV of the Policy, it does not contain the clause "including loss of use of that property." Dkt. 63-2. According to Lexington, the use of the phrase in Section IV and the absence of the phrase in Endorsement #11 indicate that the phrase was intentionally removed from the definition of "property damage" for the purposes of the Endorsement #11 exclusion. *Id.* Lexington also contends that the cases cited by PSI in support of its position are distinguishable in that they all dealt with a definition of "property damage" identical to that contained in Section IV, which it contends is broader than that contained in Endorsement #11. *Id.*

Applying established rules of insurance contract construction, this court finds that PSI's interpretation of Endorsement #11 must guide the determination of whether ERG's allegations are covered by the Policy. When the insured has proven that damage is potentially covered by the terms of an insurance policy, the burden then shifts to the insurer to prove that an exception or exclusion applies to bar coverage. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 1997). If the language of an exclusion is ambiguous, the court must adopt the interpretation of the insured if it would be reasonable to do so, even where the insurer's interpretation appears to be more reasonable. *Utica Nat'l. Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex. 2004). Only if the exclusion clearly and unambiguously prohibits coverage does an insurer meet its burden. *Nautilus Ins. Co. v. Country Oaks Apts.*, 566 F.3d 452, 454 (5th Cir. 2009). The Fifth Circuit has previously held that the term "including" is ambiguous, and can mean either "for

example" or "consisting of."  *See Williamson v. J.C. Penney Life Ins. Co.*, 226 F.3d 408, 410 (5th Cir. 2000) (noting that "[l]ittle meaning can be gleaned from the word 'includes'"); *see also United Servs. Auto. Ass'n. v. Perry*, 886 F.Supp. 596, 609 (W.D. Tex. 1995) ("While 'include' may mean 'for example,' it may also mean 'and' or 'in addition to' or even 'means.'" (citing Black's Law Dictionary (6th ed. 1990)), *rev'd on other grounds*, 102 F.3d 144 (5th Cir. 1996). In the former situation the term is merely illustrative or meant to clarify, while in the latter it is meant to signify an exhaustive list.

Lexington has not shown that Endorsement #11 clearly and unambiguously prohibits coverage.  If, for example, the term "including" as used in Section IV of the Policy is meant to clarify that loss of use of injured property is, along with other things, "physical injury to tangible property," then the exclusion of "including" in Endorsement #11 does not make the definition of "property damage" in the endorsement narrower than part a) of the definition in Section IV. Instead, Section IV merely contains clarifying language.  If Lexington had intended to exclude coverage for all "loss of use" from Endorsement #11, it could have done so in clear and explicit terms.  It did not.  Because PSI's interpretation is a reasonable construction of an otherwise ambiguous provision, this court must adopt that interpretation.

### b) Has "Property Damage" Been Alleged?

The only damages alleged by ERG in its original petition are for "excessive cost overruns."  Dkt. 1-5.  There is no mention of physical injury to, or loss of use of, tangible property.  *See id.*  The petition does not describe property damage of any kind, whether physical injury or loss of use.  *See id.*  Although claims for "costs" may be covered by a CGL policy if they flow directly from property damage to a well, the original petition alleges no facts that

suggest the "cost overruns" resulted from well damage. *See Meadows & Walker Drilling Co. v. Pac. Emp'rs. Indem. Co.*, 324 F. Supp. 282, 285 (S.D. Tex. 1971); Dkt. 1-5. Without more detail about the nature of the cost overruns allegedly experienced by ERG, the term "cost overruns" can only be reasonably read to describe economic loss and thus does not describe "property damage."

However, the facts alleged in the first amended complaint and previous case law discussing the issue of "property damage" suggest that the first amended complaint does allege "physical injury to tangible property." In Texas, an oil and gas lease is considered an interest in tangible property. *Mitchell Energy Corp. v. Samson Res. Co.*, 80 F.3d 976, 982 (5th Cir. 1996) (citing *Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991)). Federal district courts applying Texas law have consistently reasoned that damage to an oil and gas well bore constitutes "property damage" even if the damages claimed by the plaintiff are measured in terms of costs, losses, or expenses incurred during the required re-drilling of the well. *See Meadows & Walker*, 324 F. Supp. at 285; *Basic Energy Serv. v. Liberty Mut. Ins. Co.*, 655 F. Supp. 2d 666, 676 (W.D. Tex. 2009); *Mid-Continent Cas. Co. v. Bay Rock Op. Co.*, No. SA-07-CA-274-OG, 2009 WL 5341825, at *4 (W.D. Tex. Sept. 30, 2009). In *Meadows & Walker* and *Bay Rock*, the plaintiffs alleged damages resulting from a well blowout, while in *Basic Energy* the plaintiffs alleged well bore damage resulting from pipe string dropped into the well. ERG's first amended complaint alleges that, with respect to the Marrs well, Faulkner's negligent actions resulted in knocked out cement well lining, drilling in an incorrect direction, and bad hole conditions, all of which eventually required the well to be re-drilled. Dkt. 31. While these injuries may not be as extensive as a well blowout, they are all arguably descriptions of well

23

bore damage.  Thus the damage is covered "physical injury to tangible property," when these facts are construed liberally in favor of coverage as this court is required to do.

Lexington opposes this conclusion on the singular ground[2] that the cases cited by PSI are distinguishable because they involved the allegedly broader definition in part a) of "property damage" contained in Section IV of the Policy, not the allegedly narrower definition contained in Endorsement #11.  *See* Dkt. 63-2.  However, the court does not construe the definition in Endorsement #11 to be narrower than the definition in Section IV.  Beyond that, Lexington offers no cases to support its argument that no "property damage" has occurred.

Lexington also claims that any alleged damage to drilling tools, pipes, collars, machinery, or equipment is excluded by Endorsement #7.  That position is correct, *see* Dkt. 55, Exh. B (Endorsement #7), but ERG has alleged more "physical injury to tangible property" than just damage to drilling equipment in its first amended complaint.  For instance, while the casing damage alleged by ERG in paragraph 13 of its first amended complaint may be excluded by Endorsement #7, the damage to the well bore lining alleged in the same paragraph is "property damage" not excluded by either Endorsement #7 or Endorsement #11.  *See Basic Energy*, 655 F. Supp. 2d at 676 (finding that damage to a well bore is "property damage").  Only one potentially covered claim is required to trigger the insurer's duty to defend the entire suit.  *GuideOne Elite*, 197 S.W.3d at 310.  As a result, Lexington has failed to rebut PSI's showing that the ERG's first amended complaint alleges "property damage" as that term is defined in the Policy.

Thus, while ERG's original petition does not allege an "occurrence" that resulted in "property damage," ERG's first amended complaint does.

---

[2] Lexington also states that the cases cited by PSI are "distinguishable on numerous factual grounds as well" but offers no explication of this claim.

*5. The Self-Insured Retention Limit*

Lexington argues additionally that even if ERG's first amended complaint properly alleges at least one "occurrence" resulting in "property damage," PSI has nevertheless failed to show adequate proof that it has reached the self-insured retention limit ("SIR") of $100,000 contained in Endorsement #1 of the Policy. *See* Dkts. 63-2; 73. Lexington contends that while PSI has produced affidavits prepared by its counsel purporting to document the amount of PSI's legal fees and costs incurred to date, those affidavits do not properly separate the expenses incurred by PSI in defense of ERG's claims from the expenses incurred by PSI in its third-party litigation with Lexington. Dkt. 63-2. PSI counters that it has, in fact, exhausted the SIR of $100,000. Dkt. 70. PSI refers the court to the affidavit of its counsel attesting that PSI incurred $144,483 in fees and $29,766.24 in costs "related to the defense of ERG's lawsuit" as of the end of 2010 and points out that the calculated legal fees and costs do not include fees and costs that PSI's counsel incurred in litigating PSI's counterclaim against ERG for unpaid invoices. Dkt. 70, Exh. A.

In Texas, the duty to defend is determined by the terms of the policy. *GuideOne Elite*, 197 S.W.3d at 310. In this case, Endorsement #1 states that Lexington "do[es] not have the duty to investigate or defend any 'occurrence', claim or 'suit' unless and until the Retained Limit is exhausted with respect to that 'occurrence', claim or 'suit.'" Dkt. 55, Exh. B. When an insurance policy contains an SIR as a condition to the insurer's duty to defend, as the Policy does in this case, the insurer's duty to defend is not triggered until the SIR is exhausted. *U.S. Fire Ins. Co. v. Scottsdale Ins. Co.*, 264 S.W.3d 160, 173 (Tex. App.—Dallas 2008, no pet.); *see also Landstar Homes Dallas v. Mid-Continent Cas. Co.*, No. 3:10-CV-0014-K, 2010 WL

5071688, at *3 (N.D. Tex. Dec. 13, 2010) (SIRs, unlike deductibles, require an insured to assume the obligation of providing itself a defense until the SIR is exhausted).

PSI has offered affidavit evidence that, as of December 2010, PSI's counsel billed PSI over $170,000 in legal fees and costs "related to the defense of ERG's lawsuit." Dkt. 70, Exh. A. However, PSI's reply to Lexington's response does not directly address Lexington's contention that PSI has failed to separate the fees and costs it has incurred in defending ERG's lawsuit from the fees and costs incurred in litigating its third-party claim against Lexington. Dkt. 70. The affidavit attached to that reply makes no mention at all of the fees and costs related to the third-party claim against Lexington. *See* Dkt. 70, Exh. A. However, an affidavit attached to PSI's latest supplemental response suggests that PSI's counsel has billed the fees and costs associated with both the underlying claim and the third-party action to one file. Dkt. 77, Exh. A, ¶ 8 (stating that certain billing entries were "billed to the ERG defense/Lexington coverage file"). Only the fees and costs incurred in defending ERG's lawsuit count toward the SIR, and PSI's showing that it has spent considerably more than $100,000 on the combined matters does not resolve the issue.[3] *See, e.g.*, *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 685-686 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (holding that a genuine issue of material fact existed as to whether the insured exhausted its $1 million SIR, when the evidence only showed that it had incurred $5 million in undelineated expenditures).

---

[3] PSI is incurring fees and costs associated with three different matters—its defense against ERG's claims, its pursuit of its counterclaim against ERG, and its pursuit of its third-party claim against Lexington. However, PSI appears to separate these fees and costs into two groups instead of three: (1) fees and costs associated with its counterclaim against ERG; and (2) fees and costs associated with its defense against ERG and third-party complaint against Lexington, combined. *See* Dkt. 70, Exh. A; Dkt. 77, Exh. A.

Because PSI has shown that ERG's first amended complaint alleges an "occurrence" resulting in "property damage," the court GRANTS PSI's motion for summary judgment on the duty to defend issue.  Lexington has a duty to defend PSI in the underlying action.  However, under the plain terms of the Policy, Lexington's duty to defend does not arise "until the Retained Limit is exhausted with respect to that 'occurrence', claim or 'suit'."  Dkt. 55, Exh. B.  Thus, while the court GRANTS PSI's motion for summary judgment on the duty to defend insofar as its claim that the first amended complaint sufficiently alleges an "occurrence" resulting in "property damage" to trigger Lexington's duty to defend, the court additionally HOLDS that the duty is not triggered unless and until PSI provides Lexington with records indicating that it has exhausted the SIR with respect to ERG's underlying claim against PSI.  Thus, PSI must provide Lexington with a breakdown of its costs and fees relating solely to its defense against the underlying claim, exclusive of its costs and fees associated with pursuing its third-party claim against Lexington.  Once PSI has shown Lexington that it has incurred fees and costs associated with its defense against ERG's claims totaling at least $100,000, then Lexington must comply with the Policy's requirement to defend PSI.

**B. Lexington's Duty to Indemnify PSI**

Lexington also claims that it has no duty to indemnify PSI for the same reasons it claims it has no duty to defend PSI, and it seeks summary judgment on the indemnity issue.  In Texas, an "insurer's duty to defend and duty to indemnify are distinct and separate duties." *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997).  An "insurer may have a duty to defend but, eventually, no duty to indemnify." *Id.*  The "duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to

defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify*." *Id.* at 84.  "The insurer's duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions are covered by the terms of the policy.  Evidence is usually necessary in the coverage litigation to establish or refute an insurer's duty to indemnify." *D.R. Horton-Texas, Ltd. v. Markel Intern. Ins. Co., Ltd.*, 300 S.W.3d 740, 744 (Tex. 2009).   Here, there has been no evidentiary showing in the underlying action to establish or refute Lexington's duty to indemnify.   The court therefore declines to rule on the duty to indemnify at this point.   Lexington's motion for summary judgment, as it relates to the indemnification issue, is thus **DENIED WITHOUT PREJUDICE**.

## C. PSI's Claims for Attorneys' Fees, Costs, and Penalty Interest

PSI also seeks a judgment that it is entitled as a matter of law to attorneys' fees and costs incurred in the underlying suit with ERG and in litigating PSI's claims against Lexington as a result of Lexington's breach of its duty to defend PSI.  *See* Dkt. 55.   PSI's first claim for attorneys' fees is premised on the argument that Lexington's refusal to defend PSI is a violation of the Prompt Payment of Claims Act.  *Id.*   Specifically, PSI claims that Lexington violated Section 542.056(a) of the Texas Insurance Code when it failed to respond to PSI's initial request for defense until July 2, 2008, almost four months after it was notified on March 3, 2008 of ERG's original petition.  *Id.*   PSI also alleges that Lexington has never paid any amount of money toward PSI's defense in the underlying suit, which is a violation of Section 542.058(a) of the Texas Insurance Code.  *Id.*   As a result, PSI contends that it is entitled as a matter of law to attorneys' fees and costs incurred in the underlying suit plus penalty interest of 18% and prejudgment interest on that amount, as well as attorneys' fees, costs, and prejudgment interest

incurred in this action against Lexington.  *Id.*  In the alternative, PSI argues that Lexington's refusal to defend PSI is a breach of contract.  *Id.*  Consequently, PSI contends that it may recover its attorneys' fees and other expenses incurred in litigation with ERG as consequential damages resulting from Lexington's breach of its contractual duty.  *Id.*  Additionally, PSI argues that it is entitled to its attorneys' fees and costs incurred in its action against Lexington pursuant Tex. Civ. Prac. & Rem. Code § 38.001.  *Id.*

Because PSI has not provided Lexington with a sufficient breakdown of costs showing that it has exhausted the SIR, Lexington's duty to defend has not been triggered.  Thus, PSI has not shown that Lexington violated the Prompt Payment of Claims Act or that it breached its contract with regard to its duty to defend, and it is therefore not entitled to attorneys' fees relating to the alleged breach of contract.  Accordingly, PSI's motion for summary judgment with regard to its claims for breach of contract and violations of the Prompt Payment of Claims Act is **DENIED WITH PREJUDICE**.

### IV. CONCLUSION

Lexington's motion for summary judgment (Dkt. 63) is **DENIED WITH PREJUDICE** with respect to its contention that it does not have a duty to defend PSI in the underlying action, and it is **DENIED WITHOUT PREJUDICE** on the indemnification issue.  PSI's motion for summary judgment (Dkt. 55) is **GRANTED IN PART AND DENIED IN PART**.  It is **GRANTED** with respect to PSI's claims that ERG's first amended complaint sufficiently alleges an "occurrence" resulting in "property damage" under the Policy.  However, the court **HOLDS** that Lexington's duty to defend does not arise unless and until PSI presents Lexington with evidence that it has exhausted the SIR of $100,000 defending against ERG's claims. Lexington has a duty to defend PSI *once PSI has exhausted the SIR*.  PSI's motion for summary judgment is **DENIED WITH PREJUDICE** with respect to its claim for breach of contract and violations of the Texas Prompt Payment of Claims Act.

It is so ORDERED.

Signed at Houston, Texas on August 17, 2011.

_____
Gray H. Miller
United States District Judge

30